Good morning, Your Honors. My name is Karen Bucher, and I represent the appellant Arthur Williams. And with the Court's permission, I'd like to reserve two minutes for rebuttal. This is the case where the victim and her dog were found dead floating in the spa. The victim was half-nude, had her hands tied behind her back, and her dog's hind legs were tied. Mr. Williams told the jury that he was present when she died, that he indeed tied her arms, but he didn't kill her. Mr. Williams was precluded from telling the jury his side of the story, but what really happened that day, that the victim was suicidal, she was attempting to commit suicide, and that she had told him to make her death look like it was her own. Roberts, we say she was attempting to commit suicide. His story that day wasn't that she died because she was attempting to commit suicide. It was that they had a struggle and fell into the spa and so forth. So if you mean immediately as to that time, I don't think that's right. If you mean more generally, I understand the relevance, but I think there's a difference. No, no. It actually was happening. What happened, they were arguing she wanted to commit suicide, and they were talking about this for a couple of days. At this point in time --- And talking about committing suicide by your account for months and possibly years. Right. But in this particular time frame, they had been talking about this for a few days, and she wanted him to help her commit suicide. At first he was interested, but then at this particular point, he decided, no, I didn't want any part of this. And this is what that argument was about on the side of the spa. She wanted him to help her kill her, and he didn't want to do it. And she slapped him a few times, and then on the third slap, she --- he grabbed her, and then that's when they fell into the spa, and where she apparently had a heart attack, which two doctors for the defense had testified that this was clearly possible. And that he didn't kill her. And then after she died, she -- he got out of the spa and was thinking about the conversations that they had, that she wanted to -- she didn't want to look like she killed herself, but she wanted to make it look like somebody came out of the hills and raped her, and to make it look like a sex crime, and also for her dog to die. And I know it sounds strange, but the jury didn't hear the testimony from 15 different medical professionals that would have testified and corroborated Mr. Williams' statement that she was suicidal, and they didn't see the suicide note that she wrote about a month before she died. And, you know, the jury deliberated for five days, and the California courts found that the evidence was admissible, but because of lack of credibility, they didn't think that the jury would have found a different verdict. But when you look at the record, they did deliberate for five days, and they asked for a readback of his statements to Investigator Taylor, and also they wanted to hear his account of what happened that day. So they were clearly troubled. They were looking for answers. They wanted to know, how could he say, I tied her up and I didn't kill her? But they couldn't find that missing piece, so they had no other choice but to convict her. And they didn't see the testimony from the doctors would have bolstered his credibility. The suicide note would have bolstered his credibility. And also, the prosecutor really took advantage during closing argument. He took advantage of the fact that he couldn't offer his explanation or his defense. He told the jury, look, he admits to tying her up, but he can't explain to you, you know, how she was killed. He can't offer you that explanation. And the jury was clearly searching for an answer, and they couldn't find one. So they had to convict. So Mr. Allones was unable to present his complete defense, which is an unreasonable application of ---- Kennedy. Was he able to give any testimony about her desiring to commit suicide? Not at all. None? Not at all. The close he got, he said, while on the patio, that's when they were struggling, he said, we began to discuss a certain matter, which I continually kept denying that I was a part of. She started to call him names, and it got physical. And that's as close as he got to the suggestion that she wanted to commit suicide. And he also said ---- No, no testimony about what they were arguing about? No. What I just read to you, Your Honor, is as close as what got into the record. Had he offered to present evidence that what the argument was about? Yes, he did. His statement that she wanted him to enlist his help to commit suicide, that was the argument, and he refused. And what ---- And he refused. And when he was first arrested, he explained this all to the police. And what I find striking is that he told the police right away that the victim told him that she tried to kill herself in the past by injecting bleach into her veins. And I think it would have pressed upon the jury, because there's no way he could have known that this was documented medical evidence and that medical doctors would testify to the fact that she, indeed, tried to commit suicide by injecting bleach into her veins. And he told the police right away, right when he was arrested, that she was suicidal and this is what she had done. And also, another doctor was willing to testify that she ---- Didn't he tell the police that he wasn't involved in her death? Initially, he did, Your Honor. He wanted to make it look like somebody else murdered her. Yes, he was scared at the time. That is true. You know, what troubles me about this case, and this is the part you're going to want to hear, is that it seems to me that the California Court of Appeal, although it expressed it in a perhaps odd way, actually came to the conclusion that the evidence should have been admitted. They did, Your Honor. And after this, they talk about how it wasn't relevant at first, but then it became relevant because, and this is the part that's driven me, his testimony was flat-out bizarre unless he was given some basis to supplement it, because there's no way to tie it up and the dog being tied up with what he says unless in some way you can offer some outside corroboration. So the California Court of Appeal appears to come to the conclusion the evidence should have been admitted, and then in a fairly brief fashion says, but it's not prejudicial, it's harmless error because nobody could have believed what he said anyway, his credibility was impeached five ways to Sunday. Could you focus some attention on that part? You've mentioned how long the jury was out, but it seems to me that's really the whole case has to stand on as far as the State's concerned. Right. Well, that was found, the harmless error standard used there with People v. Watson, which is just the wrong standard, first of all. It should have been the standard under Chapman v. California. And the best answer I have to that is that the Court thought that the jury found him not credible. If they found him not credible, they would have returned a verdict within a day. They wouldn't have spent five days going over this and asking for a readback of his testimony. They would have just flat-out said guilty right away. So they did find some – they were missing a piece of the puzzle. And they did – they must have found him somewhat credible, unless they would have just found not guilty day one and not go through the readback. When I was looking at the final arguments of the attorneys, it didn't seem to me a big deal was made about being tied up. Did I miss something? I'm sorry? Well, I didn't think that the argument of the prosecution depended a whole lot on being tied up. Did I miss something in that? Yes, he relied – he relied on the fact that the – Mr. Williams testified he did tie her up, but couldn't offer an explanation how he didn't kill her. And the explanation was he didn't kill her because she was trying to commit suicide, but he could not bring that in. The jury could not consider. The whole point is the jury could not consider his defense. And under U.S. Supreme Court law, he has a right to present his entire defense and let the jury consider it and make its own decision. Well, that doesn't incorporate – I mean, the rules of evidence don't get incorporated by that. The fact that your – that admission is denied as to some part of the evidence doesn't turn every case into a constitutional one. So it's not simply – I mean, it's – I don't know. It's quite as simple as to say he was denied the opportunity to present his defense. You can reach a point where it becomes constitutional. I understand your argument there, but there is a distinction between a constitutional problem and rejection of evidence on some evidentiary grounds. That's true. But if you compare this case to the case I cited in my brief, DePedras v. Kuykendall, that case mirrors this case. In that case, the California court found the journal and statements relating to the journal admissible, but found it harmless. I mean, it's the same reason that there was testimony that the husband was violent. And they – the Ninth Circuit in that case analyzed the case to the U.S. Supreme Court cases, Texas v. – Washington v. Texas and Chambers v. Mississippi, and found that, no, she had a right to present the evidence of the journal to show her state of mind and why she killed her husband. In this case, it's the same analysis. He should have had the right to present his defense as to why she was tied up, why she was half-naked, and why her dog wasn't there when he says he didn't kill her. And the jury still could have found him guilty, but the point is he had a right to present his defense, and that was his only defense. Did he – you said something about a suicide note? Yes, Your Honor. Did he offer that evidence? Yes, he did. Well, he tried. During the motion to – and during the offer of proof, he did present it to the court, and it's attached as attachment one to my request for judicial notice. But it didn't go before the jury. He tried to get it in before the jury. Anything that had to do with her mental health, anything to do with her suicide tendencies, any statements that had to do with her attempts to – for suicide. When was this note written? A month before she died. It was written on April 29th, 1997, and she died on May 22nd, 1997. It was written on what date in May? It was written on April 29th. April 29th. And she'd written other suicide notes. Not that I'm aware of. Had she? That was the only handwritten suicide note that I'm aware of in this case. But she had reported to the various mental health professionals. Yes. Attempts and a desire to kill herself for, I think, years going into the past. Yes, Your Honor. It was a steady pattern. Yes, Your Honor. And what did the note say? It said if you're alive later on today, and then it was a to-do list with three things to do. But it references her death. And the jury didn't – the jury didn't have the opportunity to consider his defense. And obviously, they were searching for his defense. You know, with the readbacks and the long deliberation period, they were searching for a reason, and they couldn't find it. Well, after she was dead, well, why did he have intercourse with her? No, that's not part of the record. That didn't happen. Not in the record. No, no. After she died, he tied her up, and then he left. I thought I read something. No. Didn't she say she wanted to look as if she'd been raped and murdered? To appear. That's why he tied her hands back with extension cord and took her clothes off. But he didn't – there's nothing in the record that he raped her. And did she was found after having been on the water for a week or something like that? Six days. Six days. And also important – it's important to note that there were two doctors that say that she could – that she did have heart problems and that she could have died of heart failure. And you couldn't rule that out. But he didn't report her death. No, he didn't. He went back to Los Angeles, and he became depressed. He said he wanted – he was confused. He felt somewhat responsible. He was there when she died. And that's why he came back, because he didn't think he killed her, but he was present when she died. So that's when she came back. And he went right to the house where the police were, and he talked to them freely. And at first, yes, he did not involve them, but then he explained everything to the police as to what happened. Okay. Well, you've gone over your time, but we'll give you a minute on rebuttal. Thank you, Your Honor. Good morning. May it please the Court, Lilia Garcia, Deputy Attorney General, on behalf of Respondent. It would be our position that there was no error in this case, that the trial court in this particular case carefully evaluated the evidence and did what it was supposed to do, and considered the probative value of the evidence. Well, how could that be? I mean, am I wrong when I read the California Court of Appeal decision, and I think it says the evidence became relevant after the trial court's ruling on Williams' testimony. So I don't see the California Court of Appeals saying that the trial court was right. As to the first, there are two parts to this. This issue was litigated both at pretrial and after the defendant testified. After the defendant testified, trial counsel renewed his motion to ask the court to allow it to introduce the suicide evidence. At that point, the trial court still upheld its prior ruling without any explanation. The Court of Appeal, in evaluating the second request after the defendant had testified, in passing, and the court is absolutely correct about this, said that even if it was relevant to explain why the defendant claimed he had tied her up, it was harmless error. And … Well, doesn't that become the end? That has to be what you defend. Yes. You can defend the case by saying the evidence should have been excluded, because by the end of its decision, the Court of Appeal says it should have come in, but it's harmless error. Well, I don't think there's any point in arguing whether it should have come in anymore. Based on that, the California Court of Appeals says it should have come in. And it evaluated under the proper standard of Watson in this case. It particularly noted that it was the Watson standard that applied because there was no issue regarding a due process or violation. In other words, it did not deny him a defense. This particular evidence only went to a facet of his defense. It was to explain the many multiple versions of the defendant's testimony as to how the victim died. Initially, this was five hours of videotaped statements with the police. Initially, he denied any involvement. He created a very intricate alibi as to why he went to Los Angeles, where he stayed, what he did, after he was presented with additional evidence. He then stated at one point, I killed her, I guess I'm going to go to prison. Then he talked about the fact, well, we argued, we struggled, we fell in, it was an accident. Then he claimed it was a heart attack. So then we had the version that was presented to the trial court and to the jury. It was an accident-slash-heart attack. In other words, we accidentally fell into the spa, but then she died of a heart attack while she was in the water. The problem that he has with that is that one of the medical examiners for the prosecution testified that the victim was still alive when her hands were tied. And the court of appeal found that as a factual finding, and the magistrate judge also found that.  The court of appeal found that as a factual finding? Yes, Your Honor. It was noted in the court of appeal's decision that the victim was still alive when her hands were tied. This, of course, poses a very difficult problem for the defendant. Where is there a factual finding by the court of appeal where the court of appeal is in the business of making factual findings? Well, excuse me. Well, no. The court of appeal can rely on the evidence that was presented by the expert testimony by the doctor, by the prosecution's prosecution. It can't pick and choose the evidence. I mean, there was evidence from other doctors that did not corroborate that, that contested that. If it were true, if there were a finding of fact by the trier of fact, and we know there's no findings of fact here because it was a jury trial, but if there were a finding of fact that said he's alive, that she's alive when she's tied up, that's compelling. It sounds to me like you're pulling out a piece of evidence and placing it up as a factual finding, and those things are very, very different. Yes, Your Honor. And I'm just going to ask you, where is the factual finding by the court of appeal? There is no factual finding, but what it did to tell me that there is. But, Your Honor. Finding of fact is a term of art. It means something. Don't tell the court that there's a factual finding by the court of appeal if there's not a factual finding by the court of appeal. You can say the court of appeal cited evidence. You can point to the evidence. But don't try to tell me there's a factual finding. Your Honor, I misspoke, and I apologize for that. I didn't mean to infer that. What I was relying on was the expert's testimony that was presented in the prosecution's  case, and that was a reporter's transcript 457, 459, and 510. What does the court of appeal refer to that? The court of appeal refers to it in its statement of facts, Your Honor. And that is part of the excerpts of record that were provided to the court by appellant. And so that poses quite a problem for the defense. What does the autopsy report show? The autopsy report was inconclusive as to whether she died of a cardiac event or not. In other words, it could not be because of the level of decomposition of the body. The body had been in the water for about six days. It was not possible for the – from the autopsy report to determine whether, in fact, she had died of a heart attack. Now, the defendant did present evidence that that was a conceivable event, but it was not conclusively established one way or the other. Was water found in her lungs? I believe it was, Your Honor. Do you know? And the cause of death was drowning. Now, defense – the defense did present evidence that a contributing factor or another factor could have also been a heart attack, which was – which went to the core of his defense. In other words, he was allowed to present expert testimony as to what he believed had caused the victim's death in this case. And so because he was able to – What's the basis of the expert's conclusion that she was alive when she was tied up? Your Honor, I – you know, at this point, I cited to the record where the court of appeal relied on and where it was found in the transcripts. Well, the court of appeals said – I mean, this is – if you want to go back to that, the court of appeals, in its recitation of facts, recites that the coroner concluded she had drowned – died of drowning and was alive when her hands were tied behind her back and was placed in the water, although she also had advanced arterioscleric, whatever cardiovascular disease the coroner opined that she had not been suffering from a cardiac event when she drowned. Williams's expert, on the other hand, could not eliminate a coronary episode as a cause of death and, based on Williams's description of her death, one opined that she probably died of such an occurrence. Now, the court of appeal recites the defendant's evidence, too, and I doubt if you'd characterize that as a finding. It seems to me all that's going on here is a recitation of the evidence. And when I get back to the discussion of why this is a harmless error, I don't see very much identified in the way of specifics other than, quote, William's credibility was impeached at trial in more ways than this Court can count, which is frankly pretty compelling, because you go through the evidence. He gave lots of different stories. But I don't see anything here that points to medical evidence as saying this case must have come out this way instead of that way based on medical evidence. Well, Your Honor, but that was presented to the jury. In other words, the jury were the finders of fact. Right. And the jury comes back with a guilty verdict, but the jury didn't hear the evidence which the court of appeal said it should have heard. Well, the court – The court tells us that if that evidence had been submitted, it wouldn't have made a difference. Why do we know this is harmless error? We know it's harmless error because of the various versions, particularly because he was impeached on so many different versions. In other words, this was not a denial of a complete defense. This is not a situation where he never got an opportunity to present a defense. He was precluded from presenting a facet of his defense to explain some very bizarre behavior. When he claimed that the victim died of an accident and then he goes and ties the victim's hands, he wanted to present an explanation to the jury why he did that. However, when we – if we only were to look at it in a very narrow context, perhaps then it would become somewhat relevant. But when we look at it in an overall context, in terms of assessing prejudice, he told so many different versions. He was impeached on so many different facts. Even at the time that he – But the main answer given by defendant's counsel or Petitioner's counsel is that, gee, the jury was out five days. If it was all that simple, why did it take so long? Why did it take so long? First of all, the jury asked for a re-read of the defendant's testimony. There were five hours of videotaped interviews and transcripts. I mean, five hours is a long time. In other words, rather – I think it's speculation for counsel to suggest that the jury here was unable to reach a verdict or that this piece of evidence would have tilted in favor of the defendant. What it does suggest is because there was a lot of evidence in this case, and particularly because they were focusing on the defendant's statements, and it took five hours, at least five hours, to go over the videotaped transcripts and videotapes, that's why it took so long. I mean, in other words, there was a lot of evidence for the jury to consider. And then the question in determining whether it's harmless error is whether this piece of evidence, this explanation, would have changed the jury's outlook or decision that the defendant was guilty. Either they were going to accept, which they did, the prosecution's theory that this was a first-degree murder, that he intended to kill her, or they were going to accept that it was accidental. In other words, that he really didn't have any – he didn't have any fault or intent to kill her, and that she died of a heart attack. And if she died of a heart attack, then he's not guilty. And that was the evidence that he produced. It wasn't a – What did the judge say when the suicide note was offered in the evidence? The judge didn't find it to be relevant, and I think – What did he say? Say anything? Well, he just didn't find it – Objection sustained? No, no. This was part of a long discussion in limine or out of the presence of the jury. This was discussed at various points of the trial, and at the time that the note was offered, the Court did consider it. And I think it's wrong to characterize this as a suicide note. Attachment 1 of the materials provided by appellant, if we look at it, it hardly sounds like a suicide note. It was written a month before, which, again, it's not relevant because she died a month later, but there's three items. COD, which I guess cash on delivery, two, Marriott, which may refer to a Marriott hotel, and three, love in the afternoon. That certainly doesn't sound like somebody who is willing to kill themselves if they're already planning to have love in the afternoon. And obviously this woman was 63 years old. She was a widow. She had been befriended by the defendant, who was 37 years old. They had been living together for about two months. He had drained just about all her bank accounts. You know, I understand all that, but, you know, what bothers me is if I were a juror looking at this case, and one of the principal items of evidence is the fact the woman is found tied up in a hot tub, and her dog was tied up. And he was present at the time. The first thing that would come to my mind as a juror, well, wait a minute. Why would somebody who didn't murder her tie her up? And he was not able to ever explain why. But I think if you look in the context of it, his theory of defense at trial was that it was an accident, and that she died of a heart attack. And so how does that? Well, that fits, doesn't it? There could have been an accident. And so he had this agreement to that if she did die, that she should be tied up and make it look like it was an intruder that raped her. But that could fit in with what his theory is. But the thing that bothers me is that the big thing to explain in the whole case is if you didn't murder her, how come she's tied up and her dog's tied up? And he was unable to explain that. And assuming that he were able to explain it, assuming that the jury had heard this evidence, then at that point the Court would have had to allow not only over six or eight witnesses to testify as to her crime. Wouldn't have had to allow more than one or two. Well, that's not true, Your Honor, because the prosecution then would have a right to rebut that evidence. And I think one of the points that was made earlier was that at every time she had indicated she wanted to die, that's not true. Her past suicide attempts, she said three things. One, I knew I wasn't going to die because I'm a nurse and the pills wouldn't kill me. And two, I called my sister-in-law because she didn't want to die. And each time after she took the pills, she said she didn't want to die. So the prosecution would have been able to present evidence that this particular manner of death is so inconsistent with the prior types of suicide which involved alcohol and pills. And at each time, at those times, she said that she died of suicide. He's arguing this is the explanation I've got for this bizarre situation where she's found tied up and her dog's tied up, and he was unable to present that at all. But in order to present that evidence, the prosecution would have had a right to rebut that, that that was an incredible story. It seems like that's a very important point. And sure, the prosecution would have had an opportunity to do that. But here's some point of evidence that seemed pretty significant to me and did to the court of appeal. Well, the court of appeal said it was relevant. It didn't say it was significant. What the court of appeal found was exactly the opposite, that it wasn't significant. In other words, that this is not the kind of evidence that would have changed the jury's mind about its decision to find the defendant guilty of murder. It found the error harmless. So while it may have been relevant, the second portion of assessing error, then, is to determine whether it had an injurious effect or substantial injurious effect on the jury's verdict. And in order to assess that, we look at all the evidence that was presented by the defendant and the prosecution in this case. And even if this evidence had come in about the suicide note, about the fact that they had this allegedly, because part of the trial court's analysis was that it was unreliable. He's the only one who talked about this self-serving statement that there had been discussion of suicide a few days before. But even if that were to be allowed in, is there a reasonable possibility the jury would have reached a different verdict? In light of the other compelling evidence showing that the defendant's stories were bizarre and unreliable and not credible and that he was impeached, the answer is absolutely no. But you never know. You never know. But that's not the standard, Your Honor. Breck, that's not the standard. We could speculate. It is. We could speculate about it. But the standard on review is under Breck. And we simply don't have that in this particular case. What is the standard under Breck? Under Breck would be whether there's a substantial basis for finding that the jury would have found or been influenced by this kind of evidence. In other words, would the defendant have had a more favorable outcome? It's the same type. It's equated with the Watson standard. This Court has equated the Breck standard and the Watson standard. And that's the standard that the trial court used and the court of appeal used and the court of appeal used in assessing that the error was harmless, that while it may have been relevant, it was not substantial. And it would not have influenced the jury's verdict in this case. All right. Thank you. Thank you very much. I just have one more thing to add. Mr. Williams only had one version of what happened outside the spa, that they got in an argument and they fell in and they struggled and she died. There weren't different versions as to that part of this case. What happened during his cross-examination, he was impeached and other things about his bank account, about how much money he made, things of that nature. What about his earlier statement to the arresting officer? Yes. He initially denied involvement. Initially what? He initially denied involvement. That's correct. Any impeachment involved prior criminal convictions? No. Yes. He testified that he had prior convictions. They were all theft-related. There was no violence. I can't hear you. Yes. He testified about his prior convictions. They were all theft-related. None of them involved violence. Maybe that isn't close enough. I can hear you just fine the first time up, but I can't hear you now. Yes. He had three prior felony convictions, all theft-related. None of them involved any violence. And he testified and he told the jury that he was convicted of these crimes. So the jury was aware of his criminal past. What about the Brecht standard? That's whether or not the exclusive evidence had a substantial or injurious effect or influence on the verdict. And my argument is that it did, mainly because the jury deliberated for so long, and also his credibility would have been bolstered by the corroborating evidence of the medical professionals to substantiate what he was saying about suicide evidence. And for me personally, it's the fact that he told the arresting officer immediately after he was arrested that the victim tried to kill herself by injecting bleach into her veins, and I think that's pretty significant. And then how would he know that that's medical documented proof, that she did try to do this? I think that's critical. And I think the jury would look at that specific point and say, he's telling the police officer right when he gets arrested that she tried to kill herself by injecting bleach. I mean, how would he know that that was actually true if it wasn't true? And I think that would have bolstered his credibility. And the mental health or the suicide evidence would have had an effect on the jury's verdict, especially since they were looking for a reason. They were searching for a reason as to they couldn't reconcile the fact that he denied involvement, but yet he said he tied her up. And they couldn't reconcile those two, and so therefore, they found a guilty verdict. What about the fact that we are compelled by the Brecht standard to look at it in that way, and that the California court of appeal still found it harmless, even though it's relevant? The California court of appeal found not a Federal constitutional violation. They felt that they found a State violation, and they analyzed it under the Watson standard, the reasonable probability standard. Our argument is that this was actually a Federal constitutional violation and should have been the harmless analysis should have been under the Chapman v. California standard, harmless beyond a reasonable doubt.  Thank you, Your Honor. Interesting case. And the next matter, John Suk Hong v. Alberto Gonzalez. In this case, submission is deferred.
judges: Hug, Pregerson, Clifton